# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STEVEN M. NEPTUNE, | : |
| | : |
| Plaintiff, | : |
| | : CIVIL ACTION |
| v. | : |
| | : NO. 10-cv-2938 |
| SUN LIFE ASSURANCE COMPANY OF | : |
| CANADA, | : |
| | : |
| Defendant. | |

## MEMORANDUM,

TUCKER, C.J.                                              September ___ 6 , 2013

Steven M. Neptune ("Dr. Neptune") brings this action against Sun Life Assurance

Company of Canada ("Sun Life") for Sun Life's decision to deny Neptune's claim under a long-

term disability insurance policy issued to Dr. Neptune's former employer, Anesthesia Associates

of Lancaster, PA ("AA"). After exhausting Sun Life's internal administrative review process,

Neptune filed this action pursuant to 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement

Income Security Act ("ERISA"). Currently before me are the parties' cross motions for

summary judgment under Rule 56 of the Federal Rules of Civil Procedure. For the reasons set

forth below, I will grant Defendant Sun Life's motion for summary judgment; accordingly, Dr.

Neptune's motion for summary judgment will be denied.

## I.    FACTS AND PROCEDURAL HISTORY

Neptune worked as an anesthesiologist for AA for almost eight and a half years,

beginning in July of 1999. (R. at 209.) As an AA employee, he participated in an ERISA-

1

governed, long-term disability insurance policy (the "Policy"), administered by Sun Life. (Doc. 21 at 1-2.)

On April 25, 2007, Dr. Neptune experienced an episode of confusion and slurred speech while working on an emergent cardiac case in the operating room. (R. at 255.) He also experienced "tunnel vision and some possible visual impairment . . . This was followed by a period of nausea and diaphoresis and then vomiting and explosive diarrhea." (Id.) On the following day, April 26, 2007, Dr. Neptune visited Dr. Sallavanti and described the incident that occurred in the operating room. (R. at 729.) He explained that after he received IV fluids, he became lucid again and by the time he went home that night he drank more fluids and felt better. (Id.) During the visit, Dr. Neptune mentioned that a similar incident occurred while he was cutting down trees in June of 2004. (Id.) According to Dr. Neptune, similar to the incident on April 2007, he experienced "tunnel vision, decreased interaction with his environment and a vague sense of confusion." (R. at 255.) Again the symptoms dissipated after he drank some fluids. (Id.) Dr. Sallavanti ordered a series of tests including a CAT scan, MRI, EEG, carotid ultrasound and echocardiogram but stated that the episode "may certainly have been due to some dehydration and electrolyte abnormality." (R. at 729.)

Following the diagnostic testing ordered by Dr. Sallavanti, Dr. Neptune visited neurologist V. Mangeshkumar, M.D. on May 16, 2007. (R. at 258-60.) During his visit with Dr. Mangeshkumar, he expressed his concerns about the incident in the operating room on April 25, 2007. (Id.) He also explained that he had a history suggestive of headaches and increased sensitivity to light, smells and sound. (Id.) Dr. Mangeshkumar reviewed the MRI and described it as a "[n]ormal neurologic examination, strange neurological symptoms," and while the MRI

2

showed a few white matter lesions, Dr. Mangeshkumar suggested that a migraine can also present these abnormal white matter lesions. (Id. at 260.)

On May 18, 2007, Dr. Neptune saw Dr. Kasner for a neurovascular consultation "regarding his recent and prior episodes of altered mental status and delirium." (R. at 255.) Again, Dr. Neptune explained that event that occurred in the operating room on April 25, 2007 and the event that occurred while cutting down trees in June 2004. (Id.) Dr. Kasner reviewed the MRI and found "no evidence of acute, subacute or chronic infarction." (R. at 256.) Dr. Kasner noted that his symptoms were "somewhat non-specific and most likely reflect the dehydration and/or hypoglycemia though neither of those was documented by laboratory results." (Id.) Dr. Kasner also noted that there was a rare possibility this his symptoms were a result of a "amphetamine related vasculopathy related to his Adderall" and the "subtle white matter changes in his MRI while nonspecific could go along with a hypertensive encephalopathy or vasculopathy from the amphetamines." (Id.) Dr. Kasner discussed these results with Dr. Neptune in detail and stated that he did not see any reason why Dr. Neptune could not return to work full time. (Id. at 257.)

Following the testing and evaluations, Dr. Sallavanti wrote a letter explaining that all of Dr. Neptune's testing came back "negative without any clear source of abnormality and may be in some way related to an unusual/atypical migraine presentation." (R. at 768.) Dr. Sallavanti further stated that "it is perfectly fine for Stephen to return to work at full duties including taking call and I believe he is scheduled to begin on June 4, 2007. I have no reservations in regards to the resumption of full duties." (Id.)

3

On July 18, 2007, Dr. Neptune saw Dr. Mangeshkumar. (R. at 253.) Based on his examination of Dr. Neptune, Dr. Mangeshkumar believed that Dr. Neptune suffers from migraine headaches that "seem to be related to stress factor or exertion." (Id.) Dr. Mangeshkumar noted that he will continue to monitor Dr. Neptune's headaches but he should avoid stress, severe exertion, and dehydration. (Id. at 254.)

Dr. Neptune saw Dr. Mangeshkumar again on November 28, 2007. (R. at 250.) Dr. Neptune informed Dr. Mangeshkumar that he was "feeling much more improved now without any major events" and that he may have had "one or two minor migraine spells." (Id.) Another MRI of the brain showed an "enhancing tiny pontine lesion" which Dr. Mangeshkumar further evaluated. (Id.) Dr. Mangeshkumar suggested that while this could still be a migraine, they may have to expand the differential diagnosis. (Id.) Dr. Mangeshkumar recommended another MRI and a MR angiogram and MR venogram of the brain to ensure that he is not suffering from vasculitis or venous thrombosis. (Id. at 251.) The differential diagnosis was further expanded to "vasculitis, other demyelinating causes, including multiple sclerosis, sarcoidosis, and so on." (Id.)

Dr. Neptune resigned from AA on December 11, 2007. (R. at 209.) After resigning from AA, Dr. Neptune saw Dr. Mangeshkumar on January 3, 2008. (R. at 244.) Dr. Neptune told Dr. Mangeshkumar that he was still experiencing recurring headaches, had a difficult time concentrating, felt depressed and anxious, had trouble sleeping, experienced night sweats, had difficulty organizing his thoughts, had increased fatigue and lack of initiative, and felt distracted and irritated. (Id.) Dr. Mangeshkumar further stated that Dr. Neptune "simply does not feel like his old self." (Id.) Dr. Mangeshkumar's impression was that Dr. Neptune had a "significant

4

neurobehavior issues; deafness, tinnitus, some periventricular white matter changes, a pontine lesion, which is enhancing, and recurrent headaches." (Id. at 245.) Dr. Mangeshkumar further concluded that "[b]eing a physician in a fairly high-powered position, such as anesthesia, and given all of his symptoms and abnormal MRI findings, as an anesthesiologist he would, therefore, most unlikely to be gainfully employed." (Id.) Dr. Neptune saw Dr. Mangeshkumar again on January 11, 2008. (R. at 237.) Dr. Mangeshkumar stated that Dr. Neptune, "now being disabled as an anesthesiologist. He is unable to carry on with his regular duties actively in the operating room." (Id.) He further stated that Dr. Neptune's systems were "unchanged" and his neurological examination was normal. (Id.) Dr. Mangeshkumar found the results of a spinal tap and angiogram to be normal. (R. at 238.) According to Dr. Mangeshkumar, Dr. Neptune diagnosis appeared to be "repeat neurological events. Migraine headaches, possibly complex migraine phenomenon with no obvious focal neurological deficits currently, although he continues to have neuro-cognitive abnormalities." (Id.) Dr. Mangeshkumar recommended another MRI of the brain to determine if any new white matter lesions have developed because it could possibly be a demyelinating disease and stated that Dr. Neptune "continues to be disabled, unless he is in a different occupation where skillful intervention as an anesthesiologist are avoided." (Id.)

On January 25, 2008, Dr. Neptune's attorney, Norman Perlberger, wrote to Sun Life to provide formal notice of a disability claim as required by the disability policy. (R. at 70.) The letter indicated that "Dr. Neptune's employment with Anesthesia Associates of Lancaster, Ltd., was terminated as of December 31, 2007, due to his inability to continue to perform his professional services as an anesthesiologist." (Id.) His attorney also provided a letter from Dr.

5

Mangeshkumar explaining his condition.[1] (Id.) Susan Karnes, an underwriter/claims manager, acknowledged the receipt of the correspondence from Dr. Neptune's attorney. (R. at 73.) She also attached employee and attending physician statements ("APS") forms that Sun Life required Dr. Neptune to complete and return. (Id.)

Dr. Neptune was seen by Dr. Sallavanti on February 14, 2008. (R. at 728.) Dr. Sallavanti noted that Dr. Neptune was there for an evaluation of his underlying depression and ADD. (Id.) Dr. Neptune explained that his mood has been good but has been under "quite a bit of stress of recent with the recent judgment of being disabled because of what appears to be a brainstem infarct according to neurology." (Id.) Dr. Neptune stated that this is secondary to a significant migraine and not an embolic event per the neurologist. (Id.)

Dr. Neptune submitted various materials to the Claims Department on March 7, 2008, including a claim form, curriculum vitae, APS from Dr. Mangeshkumar, Employer's Statement; and medical records from the period of April 27, 2007 through January 11, 2008. (R. at 208-66.) The Employer's Statement suggests that Dr. Neptune resigned due to an injury or sickness arising out of employee's job and does not indicate he was terminated as the letter from Dr. Neptune's attorney indicated. (R. at 209.) Dr. Neptune's attorney further stated in a May 14, 2008 letter that Dr. Neptune "was given no option to remain in any capacity" with AA and that the severance was permanent. (R. at 708.) According to Dr. Neptune's Employee Statement, he noticed the symptoms of his illness on April 25, 2007 and described the nature of his condition as "change of mental status." (R. at 220.) He listed his last day of work as December 11, 2007 and that he first became unable to work on December 12, 2007. (Id.) Dr. Mangeshkumar

[1]The letter is based on the examination of Neptune performed by Dr. Mangeshkumar on January 3, 2008. (R. at 244-45.)

6

submitted an APS dated January 30, 2008, and provided a diagnosis of "atypical migraine - white matter disease of the brain . . . Intermittent Cognitive Difficulty . . . headaches . . . Intermittent impairment." (R. at 234.) Dr. Mangeshkumar's prognosis was guarded. (Id.) The APS stated that symptoms first appeared on May 8, 2007. (Id.)

On April 2, Dr. Neptune saw Dr. Sallavanti and had no complaints other than "a lot of stress because of his divorce proceedings." (R. at 728.)

John Graff ("Graff"), Sun Life Financial Senior Benefits Consultant, received a copy of the Claims Bureau's ongoing background check and interview with Dr. Neptune's ex-wife, Kimberly Neptune. (R. at 60; 443-50.) In the report his ex-wife discussed her ongoing divorce proceedings with Dr. Neptune and noted that the psychological problems that Dr. Neptune was experiencing have been present for number of years and that his condition has not changed in any way that would prevent him from working. (R. at 449.) She further claimed that in 2004 Dr. Neptune began "threatening to access to access his disability policy and claim both mental and physical disability . . . to reduce his financial responsibility in regard to their separation and divorce." (Id.) According to his ex-wife, he was approximately $70,000 behind in child support payments and his wages were being garnished before he stopped working at AA. (Id.)

On May 20, 2008 Dr. Neptune visited Dr. Sallavanti for an evaluation of his blood pressure. (R. at 728.) Dr. Sallavanti noted that Dr. Neptune had been feeling "up-and-down as he [was] still in a legal battle with his ex-wife for financial support" and that he had difficulty sleeping. (Id.) He further stated that he continues to see the neurologists but there has been no progression. (Id.)

7

Graff received CPT code analysis from the Arrowhead Group. (R. at 56; 711-15.) The report established that Dr. Neptune "billed an average of 151 CPT codes per month from January 1, 2006 to the present. June was his most productive month while November was his least productive month in 2006 and December in 2007." (R. at 714.)

On June 23, 2008 Graff received medical records from Dr. Sallavanti (R. at 55.) and on June 24, 2008 Loretta Dionne, Sun Life's in-house nurse, provided her medical review of the file. (R. at 806-10.) Nurse Dionne's review noted the "white matter signal[ing] abnormality in the periventricular white matter adjacent to the atria of [t]he later ventricles" and the "tiny lesion in his pontine." (R. at 809.) She concluded that the various testing of Dr. Neptune did not correlate with any physical exam findings. (Id.) Nurse Dionne further concluded that she was not aware of any event that occurred around December 11, 2007 to support the Restrictions and Limitations in Dr. Neptune's file nor did she believe that the Restrictions and Limitations were supported by medical documentation. (Id.) Her review also notes that she spoke with Graff "who will refer to a physician for a review." (R. at 810.)

On June 25, 2008, Graff contacted Jane Kramer of Professional Disability Associates ("PDA"), an outside independent medical vendor, to identify an "appropriate physician" to review Dr. Neptune's file. (R. at 54.) Jane Kramer advised Graff to forward Dr. Neptune's claim information to Dr. Kent Crossley ("Dr. Crossley"), M.D., F.A.C.P., (board certified in internal medicine). (Id.) Graff forwarded the claim forms and medical records in Dr. Neptune's file to Dr. Crossley on June 25, 2008. (R. at 802-04.) Dr. Crossley was asked to "prepare a detailed, narrative report" and "to include any objective evidence that supports your findings." (R. at 802-03.) Dr. Crossley prepared a report and noted that Dr. Neptune "was able to function

8

in his role as an anesthesiologist while on treatment for the Adult Attention Deficit Disorder" and that "[w]e have no details to support any impairment after the episode in April, 2007." (R. at 822.) Dr. Crossley also noted that based on his review of Dr. Neptune's file he did not see any support for "functional restrictions or limitations" for Dr. Neptune. (R. at 823.)

After reviewing all of the information compiled for Dr. Neptune's claim, including the medical records, CPT codes and other investigative information, as well as the reports from Nurse Dionne and Dr. Crossley, Graff determined on July 18, 2008 that Dr. Neptune failed to satisfy his burden of proving disability. (R. at 51.) On July 21, 2008, Mr. Graff stated that he would call Attorney Perlberger to inform him that Sun Life had denied Dr. Neptune's claim. (Id.) Graff provided a detailed letter on July 22, 2008 to Attorney Perlberger stating that Sun Life was "unable to substantiate a Total Disability or Partial Disability claim with respect to Dr. Neptune's condition of Atypical Migraine - white matter disease of the brain worsening on December 11, 2007 that would have precluded him from continuing to perform all the material and substantial duties of his occupation as an Anesthesiologist based on the gathered and submitted information." (R. at 834-35.) The letter also clearly explained Dr. Neptune's right to appeal the decision and the right to submit any "written comments, documents, records or other information relating to your claim for benefits." (R. at 835.)

Dr. Neptune's attorney sent correspondence to Graff on July 28, 2008 asking Sun Life to reconsider the denial of Dr. Neptune's disability claim. (R. at 840.) Attorney Perlberger also included a handwritten note along with his correspondence, the note was provided by Dr. Steven L. Galetta, a new specialist that began treating Dr. Neptune. (Id.) In the note, Dr. Galetta stated that Dr. Neptune suffered from an "abnormal brain MRI including lesions in the white matter

9

and pons. He is undergoing further diagnostic evaluation. He is unable [to] practice medicine at this time." (R. at 841.)

On July 29, 2008, Attorney Perlberger formally notified Sun Life Appeals Unit of Dr. Neptune's appeal and Sun Life assigned the appeal to Steven Leask ("Mr. Leask"), Appeals Consultant. (R. at 845; 50.) Mr. Leask decided to obtain two additional independent medical reviews though a different medical vendor agency. (R. at 50.) Mr. Leask elected to use Behavioral Medical Interventions ("BMI") to select two "appropriately credentialed physician[s]" to review all of the medical records submitted or obtained by Sun Life to date and determine whether "the medical documentation provides a reasonable basis upon which to conclude that Dr. Neptune is experiencing any functional impairments that would interfere with his ability to perform his occupation." (R. at 853-54.) BMI provided independent reviews from a board certified neurologist, Dr. Nath, and a board certified neuropsychologist, Dr. Johnston. (R. at 857-62.) Neither physician was able to identify a basis to conclude that Dr. Neptune was functionally impaired from performing the duties of an anesthesiologist as of December 2007. (Id.) Specifically, Dr. Nath stated that "[t]here is no objective evidence on his neurological examination that would support the contention that the claimant has any functional impairment that would impact his ability to engage in his occupation." (R. at 861.) Dr. Johnston noted that there is a "lack of objective evidence of cognitive impairment as well as a lack of direct observations of cognitive impairment . . . ." (Id.) Further, Dr. Johnston noted that while it is conceivable that Dr. Neptune "has sufficient difficulty with attention deployment that his work as an anesthesiologist would be adversely affected, available documentation simply does not corroborate impairment." (Id. at 862.) According to Dr. Johnston, the "impressions provided by

10

treating providers merely recapitulate the claimant's subjective self-report." (Id.) Additionally,

Dr. Nath and Dr. Johnston both considered the note provided by Dr. Galetta, however they both

concluded that the letter did not substantiate Dr. Neptune's contention that he was unable to

work. (R. at 861.) On August 28, 2008, Mr. Leask sent a detailed letter to Attorney Perlberger

explaining why Mr. Leask upheld Mr. Graff's determination to deny Dr. Neptune's claim. (R. at

863-65.) Specifically the correspondence stated:

> Sun Life has completed multiple medical reviews as part of both the initial and
> appeal reviews of the file. Despite Dr. Galetta's opinion to the contrary, Dr. Neptune
> has not provided reasonable proof that he is experiencing any cognitive or neurologic
> deficits which would reasonably impair his ability to perform the Material and
> Substantial Duties of his Own Occupation as an anesthesiologist. (Id.)

At this point, Sun Life had provided a "full and fair review" of Dr. Neptune's claim as required

by ERISA. However, on September 5, 2008 Mr. Perlberger sent a letter to Mr. Leask

acknowledging that Dr. Neptune's claim had been denied, all administrative remedies had now

been exhausted, and admitting that Dr. Galetta's letter was a "short handwritten note conclusory

in nature" but requesting Sun Life to reconsider his claim in light of the comprehensive report of

Dr. Galetta, which was included with the letter. (R. at 866-67.) Dr. Galetta's new report stated

that Dr. Neptune had not reported any new episodes of confusion and advised Dr. Neptune not to

work for a period of six months, however if the episodes do not occur over the six month time

frame he would be cleared to return to his typical occupation." (R. at 867-68.)

Mr. Leask agreed to consider the supplementary material, although there was no

obligation to do so, and requested BMI to provide the additional material to Dr. Nath to

determine if the information would alter his conclusions in anyway. (R. at 49; 873.) Dr. Nath's

review of the additional information did not alter his conclusion, he stated:

11

> Based on this note, there continues to be no objective evidence to support that the claimant is unable to work in his own occupation. Dr. Galetta's contention that the claimant should not work for six months is not supported by the evidence and Dr. Galetta does not explain why he makes such a recommendation. (R. at 875-76.)

Accordingly, Mr. Leask declined to alter Sun Life's denial of Dr. Neptune's claim and communicated this in a letter to Mr. Perlberger dated September 29, 2008. (R. at 874.)

After almost two years, Mr. D. Scott Bonebrake ('Mr. Bonebrake") sent a letter to Mr. Leask on June 14, 2010 enclosing medical documentation including a May 25, 2010 report from Dr. Mangeshkumar and stating that a "suit is being filed in federal court." (R. at 878.) In a letter date June 18, 2010, Mr. Leask responded to Mr. Bonebrake's letter and stated that "Dr. Neptune's administrative remedies were exhausted after Sun Life completed the appeal determination" therefore his administrative record was closed at that time and the additional medical documentation included with Mr. Bonebrake's letter will not be included in the administrative record. (R. at 896.) On June 18, 2010, Dr. Neptune filed a complaint against Sun Life in the Eastern District of Pennsylvania challenging Sun Life's denial of Dr. Neptune's claim.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Notwithstanding, "Where the decision [of an ERISA-governed plan] to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Davis v. Broadspire Servs., Inc.*, No. 05-5829, 2006 WL 3486464, at *1 (E.D. Pa. Dec. 1, 2006) (quoting

12

*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)) (internal quotation marks omitted).

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan confers such discretionary authority on an administrator or fiduciary, however, the district court reviews the administrator's denial of benefits under an "arbitrary and capricious," or abuse of discretion, standard. *See id.*; *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844-45 (3d Cir. 2011). "An administrator's decision is arbitrary and capricious 'if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'"[2] *Miller*, 632 F.3d at 845 (quoting *Abnathya v. Hoffmann-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir. 1993)) (internal quotation marks omitted). "This scope of review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining the eligibility for plan benefits.'" *Abnathya*, 2 F.3d at 45 (quoting *Lucash v. Strick Corp.*, 602 F.Supp. 430, 434 (E.D. Pa. 1984)). Nevertheless, while "the arbitrary and capricious standard is extremely deferential, '[i]t is not . . . without some teeth. Deferential review is not no review, and deference need not be abject.'" *Moskalski v. Bayer Corp.*, No. 2:06-cv-568, 2008 WL 2096892, at *4 (W.D. Pa. May 16, 2008) (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).

---

[2]The Third Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Soubik v. Dir., Office of Workers' Comp. Programs*, 366 F.3d 226, 233 (3d Cir. 2004)).

13

Here the Policy language is clear that Sun Life holds the discretionary authority to determine eligibility for Policy benefits. The Policy states that Sun Life has full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy. (R. at 1035.) Further, a Summary Plan Description ("SDP") cannot alter the terms of the plan as Plaintiff's suggest by citing to the language contained in the SDP. *See Cigna Corp. v. Amara*, 131 S.Ct. 1866, 1877 (2011) (holding that that the SDP cannot alter the terms of the plan itself and plan is the controlling document.) However, even if the Court were to only consider the "satisfactory to Sun Life" language from the SDP as Plaintiff suggests (Doc. 22 at 2.), the language is sufficient to confer discretion because it sets forth a subjective standard. Furthermore, because Sun Life had discretionary authority to determine eligibility for the Policy the proper standard of review is the arbitrary and capricious standard. The only question that remains with respect to the standard of review is whether a conflict of interest exists in Sun Life's administration of the plan such that it should be considered as a factor in reviewing Sun Life's denial of benefits. Dr. Neptune argues that such a conflict of interest exists.

As the Supreme Court stated in *Firestone Tire & Rubber Co. v. Bruch*, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, cmt. d (1959)). In *Metropolitan Life Insurance Co. v. Glenn*, the Court held that a conflict of interest exists where "the entity that administers the plan . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." *Glenn*, 554 U.S. at 108. Dr. Neptune argues that exactly such a situation exists here because Sun Life acted as both the claims administrator

14

and insurer of the plan (Doc. 22 at 3.), and asks the court to consider the conflict as a factor upon review. However, "[c]ourts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). Further, in *Glenn*, the court stated, for example, that the conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Glenn*, 554 U.S. at 117. Here, Sun Life has taken active steps to reduce the potential bias and the conflict is reduced to the vanishing point. First, Sun Life forwarded Dr. Neptune's file to an independent medical vendor, PDA, for a review by an appropriate doctor. (R. at 54-55; 805-10.) PDA then selected Dr. Crossley to conduct the independent review. (Id.) Next, Sun Life maintained a separate unit to review the appeal of denied claims, therefore Mr. Leask, who had nothing to do with the initial claim reviewed Dr. Neptune's appeal. (Doc. 21 at 19.) (R. 50; 855; 852.) Lastly, another independent medical vendor, BMI, identified two additional independent doctors, Dr. Nath and Dr. Johnston, to provide reviews of Dr. Neptune's file. (R. 49-50; 853-54; 857-62.) I find that Sun Life took the appropriate steps to reduce the potential bias and ensure accuracy therefore the conflict is not an important factor in this case.

## III. DISCUSSION

The bulk of the parties' cross motions are concerned with whether there was an abuse of discretion in the denial of Dr. Neptune's disability claim.

15

**A.**                    **Sun Life's Review Was Not Arbitrary and Capricious**

Sun Life's chief argument is that their denial of benefits cannot be considered arbitrary

and capricious because Dr. Neptune "did not satisfy his burden of proving that sickness injury

prevented him from performing the Material and Substantial Duties of his Occupation." (Doc.

21 at 1.) After a thorough review of the administrative record, based on the information

available to Sun Life at the time of its final review, I conclude that there was substantial evidence

for Sun Life to deny Dr. Neptune benefits and the decision was not arbitrary and capricious.[1]

To be eligible for LTD benefits, an applicant must meet the definition of disability as

supplied by the Plan. The test of disability under the Plan states the following: "during the

Elimination Period and thereafter, the Employee, because of Injury or Sickness, is unable to

perform all of the material and substantial duties of his own occupation." (R. at 928.) The Plan

states that the term 'material and substantial duties,' "means, but is not limited to, the essential

tasks, functions, skills or responsibilities required by employers for the performance of the

Employee's Own Occupation. Material and Substantial Duties does not include any tasks,

functions, skills or responsibilities that could be reasonably modified or omitted from the

Employee's Own Occupation." (R. at 930.) The burden of providing "proof of claim" is placed

on the claimant and the "proof must be satisfactory to Sun Life." (R. at 1034-35.)

Sun Life provided a thorough review of Dr. Neptune's claim. Sun Life's Benefits

Consultant, John Graff, reviewed the claim documents and worked with Dr. Neptune's attorney

to ensure he obtained all of Dr. Neptune's medical records. (R. at 60; 62; 716-18.) The records

indicated that Dr. Neptune had suffered from Attention Deficit Disorder ("ADD"), depression,

---

[1] This Court will not consider the additional materials submitted by Mr. Bonebrake in September, almost two years after Sun Life made a final decision and closed the administrative record. The Third Circuit has held that "the record for arbitrary-and-capricious review of ERISA benefits denial is the record made before the plan administrator, and cannot be supplemented during litigation." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 793 (3d Cir. 2010) (quoting *Kosiba v. Merck & Co.*, 384 F.3d 58 67 n.5 (3d Cir. 2004). (internal quotations omitted.)

and was dealing with a stressful divorce. (R. at 728-33.) The records further identified an episode of confusion Dr. Neptune experienced while he was in the operating room on April 25, 2007, however, after undergoing numerous tests, doctors were only able to identify "two tiny areas in the posterior white matter bilaterally of increased signal intensity, that were somewhat nonspecific." (R. at 255-57.) Dr. Sallavanti, Dr. Neptune's treating physician, stated that "[a]ll [of Dr. Neptune's] testing has essentially come back negative without any clear source of abnormality and maybe in some way related to an unusual/atypical migraine presentation." (R. at 768.) Dr. Sallavanti further stated that he believed that Dr. Neptune was "perfectly fine" to return to work and had "no reservations in regards to this resumption of full duties." (Id.) Dr. Neptune retuned, there was no indication of any issues or decreased productivity until he stopped working in December 2007. (R. at 711-15.) Shortly before leaving AA, Dr. Neptune saw Dr. Mangeshkumar on November 28, 2007. (R. at 250.) Dr. Mangeshkumar noted that Dr. Neptune stated that he was "feeling much improved now without any major events. He may have had one or two minor migraine spells." (Id.) Dr. Mangeshkumar also noted the "tiny pontine lesion" and the need for a follow-up MRI to rule out other possible issues but stated that his neurological examination was normal. (R. at 250-51.) On January 3, 2008, Dr. Neptune told Dr. Mangeshkumar that he was still experiencing recurring headaches, had a difficult time concentrating, felt depressed and anxious, had trouble sleeping, experienced night sweats, had difficulty organizing his thoughts, had increased fatigue and lack of initiative, and felt distracted and irritated. (R. at 244-45.) Dr. Neptune further stated that "[h]e simply does not feel like his old self." (Id.) Dr. Mangeshkumar's impression was that Dr. Neptune had "significant neurobehavior issues; deafness, tinnitus, some periventricular white matter changes, a pontine lesion, which is enhancing, and recurrent headaches." (Id.) Dr. Mangeshkumar further

concluded that "[b]eing a physician in a fairly high-powered position, such as anesthesia, and given all of his symptoms and abnormal MRI findings, as an anesthesiologist he would, therefore, most unlikely to be gainfully employed." (Id.) Dr. Neptune saw Dr. Mangeshkumar again on January 11, 2008. (R. at 237-38.) Dr. Mangeshkumar then stated that Dr. Neptune, "is now being disabled as an anesthesiologist. He is unable to carry on with his regular duties actively in the operating room." (Id.) He further stated that Dr. Neptune's systems were "unchanged" and his neurological examination was normal. (Id.) Dr. Mangeshkumar found the results of a spinal tap and angiogram to be normal. (Id.)

Mr. Graff reviewed the file with the information provided by AA and Dr. Neptune's treating physicians but given the discrepancies, referred the file to Sun Life's medical consultant, Loretta Dionne, R.N. for a medical review. Nurse Dionne's review noted that the "white matter signal abnormality in the periventricular white matter adjacent to the atria of [t]he later ventricles" and the presence of a "tiny lesion in his pontine." (R. at 809.) She concluded that the various testing of Dr. Neptune did not correlate with any physical exam findings. (Id.) Nurse Dionne further concluded that she was not aware of any event that occurred around December 11, 2007 to support the Restrictions and Limitations in Dr. Neptune's file nor did she believe that the Restrictions and Limitations were supported by medical documentation. (Id.)

On June 25, 2008, Graff contacted PDA to identify an "appropriate physician" to review Dr. Neptune's file. (R. at 54.) Jane Kramer advised Graff to forward Dr. Neptune's claim information to Dr. Kent Crossley, M.D., F.A.C.P., (board certified in internal medicine). (Id.) Graff forwarded the claim forms and medical records in Dr. Neptune's file to Dr. Crossley on June 28, 2008. (R. at 802-04.) Dr. Crossley was asked to "prepare a detailed, narrative report" and "to include any objective evidence that supports your findings." (Id.) Dr. Crossley prepared

18

a report and noted that Dr. Neptune "was able to function in his role as an anesthesiologist while on treatment for the Adult Attention Deficit Disorder" and that "[w]e have no details to support any impairment after the episode in April, 2007." (R. at 822.) Dr. Crossley also noted that based on his review of Dr. Neptune's file he did not see any support for "functional restrictions or limitations" for Dr. Neptune. (R. at 823.)

After reviewing all of the information compiled for Dr. Neptune's claim, including the medical records, CPT codes and other investigative information, as well as the reports from Nurse Dionne and Dr. Crossley, Graff determined on July 18, 2008 that Dr. Neptune failed to satisfy his burden of proving disability. (R. at 51.) Graff provided a detailed letter on July 22, 2008 to Attorney Perlberger stating that Sun Life was unable to substantiate a Total Disability or Partial Disability claim with respect to Dr. Neptune's condition of "atypical migraine - white matter disease of the brain" worsening on December 11, 2007 in a way that would have precluded him from continuing to perform all the material and substantial duties of his occupation as an Anesthesiologist based on the gathered and submitted information. (R. at 834.) Attorney Perlberger clearly explained Dr. Neptune's right to appeal the decision and the right to submit any "written comments, documents, records or other information relating to your claim for benefits." (R. at 835.)

Dr. Neptune's attorney sent correspondence to Graff on July 28, 2008 asking Sun Life to reconsider the denial of Dr. Neptune's disability claim. (R. at 840.) Attorney Perlberger also included a handwritten note along with his correspondence, the note was provided by Dr. Steven L. Galetta, a new specialist that began treating Dr. Neptune. (Id.) In the note, Dr. Galetta stated that Dr. Neptune suffered from an "abnormal brain MRI including lesions in the white matter

19

and pons. He is undergoing further diagnostic evaluation. He is unable practice medicine at this time." (R. at 841.)

On July 29, 2008, Attorney Perlberger formally notified Sun Life Appeals Unit of Dr. Neptune's appeal and Sun Life assigned the appeal to Steven Leask ("Leask"), Appeals Consultant. (R. at 845; 50.) Leask decided to obtain two additional independent medical reviews though a different medical vendor agency. (R. at 50.) Mr. Leask elected to use BMI to select two "appropriately credentialed physician[s]" to review all of the medical records submitted or obtained by Sun Life to date and determine whether "the medical documentation provides a reasonable basis upon which to conclude that Dr. Neptune is experiencing any functional impairments that would interfere with his ability to perform his occupation." (R. at 853-54.) BMI provided independent reviews from a board certified neurologist, Dr. Nath, and a board certified neuropsychologist, Dr. Johnston. (R. at 857-62.) Neither physician was able to identify a basis to conclude that Dr. Neptune was functionally impaired from performing the duties of an anesthesiologist as of December 2007. (Id.) Specifically, Dr. Nath stated that "[t]here is no objective evidence on his neurological examination that would support the contention that the claimant has any functional impairment that would impact his ability to engage in his occupation." (R. at 861.) Dr. Johnston notes that there is a "lack of objective evidence of cognitive impairment as well as a lack of direct observations of cognitive impairment." (Id.) Further, Dr. Johnston noted that it is conceivable that Dr. Neptune "has sufficient difficulty with attention deployment that his work as an anesthesiologist would be adversely affected, available documentation simply does not corroborate impairment." (R. at 862.) According to Dr. Johnston, the "impressions provided by treating providers merely recapitulate the claimant's subjective self-report." (Id.) Additionally, Dr. Nath and Dr. Johnston

20

both considered the note provided by Dr. Galetta, however they both concluded that the letter did

not substantiate Neptune's contention that he was unable to work." (R. at 861.) On August 28,

2008, Mr. Leask sent a detailed letter to Attorney Perlberger explaining why Mr. Leask upheld

Mr. Graff's determination to deny Dr. Neptune's claim. (R. at 863-65.) Specifically the

correspondence stated:

> Sun Life has completed multiple medical reviews as part of both the initial and
> appeal reviews of the file. Despite Dr. Galetta's opinion to the contrary, Dr. Neptune
> has not provided reasonable proof that he is experiencing any cognitive or neurologic
> deficits which would reasonably impair his ability to perform the Material and
> Substantial Duties of his Own Occupation as an anesthesiologist. (Id.)

Sun Life had now provided a "full and fair review" of Dr. Neptune's claim as required by

ERISA. However, on September 5, 2008 Mr. Perlberger sent a letter to Mr. Leask

acknowledging that Dr. Neptune's claim has been denied and all administrative remedies had

now been exhausted and admitting that Dr. Galetta was a "short handwritten note conclusory in

nature" but requesting Sun Life to reconsider his claim in light of the comprehensive report of

Dr. Galetta, which was included with the letter. (R. at 866-67.) Dr. Galetta's new report stated

that Dr. Neptune has no reported any new episodes of confusion and advised Dr. Neptune not to

work for a period of six months, however if the episodes do not occur over the six month time

frame he would be cleared to return to his typical occupation." (R. at 867-68.)

Mr. Leask agreed to consider the supplementary material, although there was no

obligation to do so, and requested BMI to provide the additional material to Dr. Nath to

determine if the information would alter his conclusions in any way. (R. at 49; 873.) Dr. Nath's

review of the additional information did not alter his conclusion, he stated:

> Based on this note, there continues to be no objective evidence to support that the
> claimant is unable to work in his own occupation. Dr. Galetta's contention that the

21

claimant should not work for six months is not supported by the evidence and Dr. Galetta does not explain why he makes such a recommendation. (R. at 875-76.)

Accordingly, Mr. Leask declined to alter Sun Life's denial of Dr. Neptune's claim and communicated this in a letter to Mr. Perlberger dated September 29, 2008. (R. at 874.)

Sun Life's decision to deny Dr. Neptune's claim was a result of a very thorough process, Sun Life completed an internal review and obtained the opinion of three independent doctors. Each of the doctors reviewed the medical records of Dr. Neptune's treating physicians and was unable to identify anything in the records that indicated that a specific physical ailment that prevented Dr. Neptune from performing the material substantial duties of his job. Pursuant to the Policy, Dr. Neptune had the burden of establishing his disability but there is substantial evidence in his medical records to establish that he failed to meet this burden.

In fact, Dr. Neptune's own doctors cleared him to return to work after the episode in the operating room in April 2007 and there is nothing in his medical records to suggest that his doctors believed he was unable to work before he resigned from AA in December 2007. Dr. Neptune's performance in the months following his return to work after the April 2007 episode in the operating room is further evidence to support Sun Life's decision.

While it is true that after Dr. Neptune left AA, Dr. Mangeshkumar and Dr. Galetta opined that Dr. Neptune was unable to work, neither doctor explained why Dr. Neptune was unable to work when he was previously cleared to work by his doctors following the April 2007 episode. Further, it appears from the records that both doctors relied only on Dr. Neptune's subjective complaints. Although Dr. Mangeshkumar and Dr. Galetta relied on Dr. Neptune's complaints at face value, Sun Life had full discretion to credit the opinions of the independent doctors who conducted reviews on behalf of Sun Life. All three doctors, including Sun Life's in-house nurse, disagreed with the opinions of Dr. Mangeshkumar and Dr. Galetta based on the

22

normal test results and lack of evidence identifying any functional impairment. *See Black &*
*Decker Disability Plan v. Nord,* 538 U.S. 822, 832-834 (2003) (holding that courts cannot
"require administrators automatically to accord special weight to the opinions of a claimant's
physician; nor may courts impose on administrators a discrete burden of explanation when they
credit reliable evidence that conflicts with a treating physician's evaluation."); *Abnathya,* 2 F.3d
at 47-48 (holding administrator did not abuse its discretion in deferring to the opinions of two
independent physicians reviews over the conclusory opinion of the treating physician that the
claimant was "disabled"); (*Kovach v. Unum Life Ins. Co.,* 08-5388 WL 5217076 (E.D.Pa. Dec.
30, 2009) ("an administrator is permitted to rely on the opinions of its own consulting doctors . . .
and does not need to provide a special explanation of the weights given to each piece of evidence
considered in making the decision.") (citing *Schlegel v. Life Ins. Co. of North American,* 269 F.
Supp. 2d 612, 627 (E.D.Pa. 2003) and *Nichols v. Verizon Communications, Inc.*, 78 Fed.Appx.
209 (3d Cir. 2003)).

   While it is apparent that there is a conflict in opinion between Dr. Neptune's treating
physicians and Sun Life's in-house nurse and independent reviewers, it is not enough to render
Sun Life's denial of Dr. Neptune's claim as arbitrary and capricious. *See Stratton v. E.I. DuPont*
*De Nemours & Co.,* 363 F. 3d 250, 258 (3d Cir. 2004) (holding that "[a] professional
disagreement does not amount to an arbitrary refusal to credit."); *Orvosh v. Program of Group*
*Ins. For Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 127-31 (3d Cir. 2000)
(concluding that it was not arbitrary and capricious to rely on the opinions of the administrator's
physicians despite the claimant's treating physician's opinion that the claimant was disabled);
*Forchic v. Lippincott, Jacobs & Gruder,* 1999 U.S. Dist. LEXIS 21419, at *4 (D.N.J. Nov. 29,
1999), *aff'd,* 262 F.3d 403 (3d Cir. 2001) ("[I]t is not improper to rely on the opinions of non-

examining physicians who had before them the entire record of medical evidence, more evidence than was available to any one doctor who saw plaintiff previously.").

Therefore, upon careful review of the record that was before Sun Life, I conclude that its decision was reasoned, and based on substantial evidence; thus, the decision was not arbitrary and capricious.

## IV.        CONCLUSION

For the foregoing reasons, Sun Life's motion for summary judgment will be granted, while Dr. Neptune's motion for summary judgment will be denied. An appropriate order follows.